J-S15030-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN RE: ADOPTION OF A.L.M. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.A.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1754 WDA 2018 |

Appeal from the Order Entered November 8, 2018
In the Court of Common Pleas of Clearfield County Orphans' Court at
No(s): OC No. 3482-2018

| | | |
|---|---|---|
| IN RE: ADOPTION OF K.A.M. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.A.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1755 WDA 2018 |

Appeal from the Order Entered November 8, 2018
In the Court of Common Pleas of Clearfield County Orphans' Court at
No(s): OC No. 3483 - 2018

| | | |
|---|---|---|
| IN RE: ADOPTION OF P.N.M. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.A.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1756 WDA 2018 |

Appeal from the Order Entered November 8, 2018
In the Court of Common Pleas of Clearfield County Orphans' Court at
No(s): OC No. 3481-2018

BEFORE:   GANTMAN, P.J.E., SHOGAN, J., and COLINS*, J.

_____

*   Retired Senior Judge assigned to the Superior Court.

MEMORANDUM BY SHOGAN, J.:                    FILED JUNE 18, 2019

J.A.M. ("Father") appeals from the November 8, 2018 orders in the Court of Common Pleas of Clearfield County involuntarily terminating his parental rights to his three daughters, A.L.M., born in August of 2010, P.N.M., born in May of 2008, and K.A.M., born in July of 2007 (collectively, "Children").[1]  After careful review, we affirm.

This appeal arises from the petitions filed by Children's maternal grandparents, J.E.V. ("Grandfather") and S.L.V. ("Grandmother") (collectively, "Grandparents"), on April 12, 2018, for the involuntary termination of Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).  In their petitions, Grandparents averred their intent to adopt Children.

Hearings on the petitions were held on July 31, 2018, and August 29, 2018, during which Courtney L. Kubista, Esquire, represented the legal interests of Children, who were then ages eleven, ten, and eight, respectively.[2]

_____

[1] The certified record does not include orders terminating the parental rights of Children's mother, J.S.V. ("Mother").  The record includes consents to adoption executed by Mother and attached as exhibits to the petitions for the involuntary termination of Father's parental rights.  However, there is no indication in the record that petitions to confirm the consent to adoption as required by 23 Pa.C.S. § 2502 (Alternative procedure for relinquishment) have been filed.

[2] Pursuant to 23 Pa.C.S. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who

- 2 -

Grandparents presented the testimony of the following witnesses: Virginia Johnson, a licensed professional counselor at Cen-Clear Mental Health Services who provided treatment to Children, presented via telephone; Grandfather; Loralai Finley, former clinical supervisor at Cen-Clear Mental Health Services; and Grandmother. Father testified on his own behalf.

The testimonial evidence revealed that since the birth of his oldest child, K.A.M., Father has been incarcerated at least five times. N.T., 8/29/18, at 37. Father had a series of probation revocations due to illegal drug use that resulted in his incarceration for sixty days in 2007, forty-five days in 2008, thirty days in 2009, and eleven months in 2010. Id. at 37–38, 44. In addition, on November 25, 2011, Father was arrested for the crimes of endangering the welfare of a child and false imprisonment. Father perpetrated these crimes against K.A.M., and he pleaded guilty to them. Id. at 16; N.T., 7/31/18, at 105. Father testified that the crimes involved "[t]ying her up and blindfolding her." N.T., 8/29/18, at 16. As part of Father's sentence, the court issued a no-contact order against him with respect to K.A.M. Id. at 17. Father was incarcerated for 438 days, or until February 4, 2013. Id. at 39, 40–42.

_____

discerns and advocates for the child's legal interests, which our Supreme Court has defined as a child's preferred outcome. See In re T.S., 192 A.3d 1080 (Pa. 2018) (citing In re Adoption of L.B.M., 161 A.3d 172 (Pa. 2017)).

In October of 2013, Father's probation was revoked because he tested positive for THC (Tetrohydrocannabinol). N.T., 8/29/18, at 42. Father was sentenced to a term of incarceration of six months to five years. Id. He was incarcerated for approximately eight months. Id.

In November of 2015, Father's probation was revoked again, and he was incarcerated for crimes involving possession of methamphetamine, marijuana, and offensive weapons, all of which were found in his home. N.T., 8/29/18, at 20, 47. Father was released from prison in April of 2018, approximately three months before the commencement of the subject proceedings, at which time he remained on parole. N.T., 7/31/18, at 101.

During Father's periods of incarceration, Grandparents cared for Children. N.T., 7/31/18, at 112. After each of Father's releases from prison, Children returned to his custody. However, K.A.M. never returned to Father's custody after his release in February of 2013, as a result of the crimes committed against her. Id. As such, K.A.M. has consistently resided with Grandparents since Father's arrest in November of 2011. Id. P.N.M. and A.L.M. have consistently resided with Grandparents since Father's arrest in November of 2015. Id.

On an unspecified date when she was in Father's custody prior to his re-incarceration, P.N.M. alleged to Ms. Finley, the former clinical supervisor at Cen-Clear Mental Health Services, that Father pointed a gun at her head. N.T., 7/31/18, at 80, 83, 92–93. In December of 2016, Ms. Finley filed a ChildLine

report with respect to the alleged incident.[3]  Id. at 95.  Based on the same allegation by P.N.M., Grandparents filed a Protection from Abuse ("PFA") petition, 23 Pa.C.S. §§ 6101–6122, against Father on behalf of Children and themselves.  Id. at 108.  In April of 2017, the court issued a final PFA order against Father that would expire in three years.  Id. at 109.

Following the evidentiary hearing on the involuntary termination petitions, the orphans' court directed all counsel to submit briefs within 30 days of receipt of the transcripts.[4]  By orders entered November 8, 2018, the orphans' court involuntarily terminated Father's parental rights to Children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).  Father timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i) and (b), which this Court consolidated sua sponte.  Order, 12/27/18.  In lieu of filing an opinion pursuant to Pa.R.A.P. 1925(a), the orphans' court relied upon its opinion that accompanied the involuntary termination orders.

On appeal, Father presents the following issue for our review:

_____

[3]  By letter dated February 8, 2017, the Jefferson County Children and Youth Services deemed the report indicated and found that P.N.M. was a victim of abuse by Father.  N.T., 7/31/18, at Petitioner's Exhibit 1.

[4]  In her letter brief to the orphans' court, the children's counsel, Attorney Kubista, stated that she met with Children extensively about this matter. Attorney Kubista stated that Children are in agreement with the termination of Father's parental rights and that they do not want to see him again. Likewise, Attorney Kubista has filed a brief in this appeal wherein she argues in support of the orders involuntarily terminating Father's parental rights.

> Whether the evidence presented was sufficient for the [orphans'] court to rule that [Grandparents] met their burdens of proof by clear and convincing evidence to terminate the parental rights of [Father] . . . as to [Children] . . .[?]

Father's Brief at 4.

> We review Father's issue according to the following standard:
>
> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

> Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101–2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

- 6 -

Instantly, we conclude that the certified record supports the orders pursuant to Section 2511(a)(2) and (b), which provide as follows.

(a) General Rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b); see also In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004) (en banc) (stating that we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm).

This Court has explained that the moving party must produce clear and convincing evidence with respect to the following elements to terminate parental rights pursuant to Section 2511(a)(2):

> (1) repeated and continued incapacity, abuse, neglect or refusal;
> (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

In re Adoption of M.E.P., 825 A.2d 1266, 1272 (Pa. Super. 2003).

Pursuant to Section 2511(a)(2), parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. In re A.L.D., 797 A.2d 326, 340 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. Id. Further, the grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. Id. at 337.

In In re Adoption of S.P., 47 A.3d 817 (Pa. 2012), our Supreme Court addressed the relevance of incarceration in termination decisions under Section 2511(a)(2). The S.P. Court held that:

> incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

In re Adoption of S.P., 47 A.3d at 828.

Father argues that he "has remedied or is working to remedy all the conditions that led to the removal of the Children (those that are within his power and personal ability)." Father's Brief at 18. Specifically, Father asserts that at the time of the hearing, he was employed, enrolled in Narcotics Anonymous meetings, and he was regularly volunteering for work at a local church. Id. at 19. Father's claim is without merit. The orphans' court concluded, "Father is unwilling or unable to perform the basic parental duties that are required for the Children." Trial Court Opinion, 11/8/18, at 11. We discern no abuse of discretion.

Father acknowledged that he has been in prison for the majority of Children's lives. N.T., 8/29/18, at 42–43. He testified on cross-examination by Grandparents' counsel, "I can't make up for being gone. I can just make right for the future and for this to not ever happen again. … I know what I did was wrong, I mean, going to jail and being away from them. And it hurt me, but it hurt them more. And I'm just never going to let that happen again." Id. at 43. To that effect, Father testified that he is no longer a drug addict. Id. at 44.

Nevertheless, Father testified on cross-examination by Grandparents' counsel with respect to photographs he posted on Facebook, as follows:

Q. [D]o you recognize this to be your [F]acebook page?

A. Yes.

Q. And the predominant photo in the center of the page appears to be a gravestone; is that right?

A. Yes.

Q. And what are the plants growing out of the gravestone?

A. Marijuana.

Q. And did you post it to your [F]acebook page?

A. I did.

Q. And when did you post this to your [F]acebook page?

A. May 10th.

Q. Is that this year?

A. Yes.

Q. Flip the page, please.  Is this also your [F]acebook page?

A. Yes.

Q. And are those also marijuana plants?

A. Yes.

Q. And did you post that on May 9th of this year?

A. I did.  But it doesn't mean I was to use drugs.

Q. It's not.

A. It's just pictures.

Q. Is marijuana drugs?

        *   *   *

A. Yes, it is.

Q. But you don't want to use drugs?

A. I don't use drugs.

Q. Do you want to use drugs?

A. I do not want to use drugs. I'm here right now because I've always used drugs.

\* \* \*

Q. Why are you posting [F]acebook photos depicting illegal narcotics a month after you were released from prison?

A. Because I can.

Id. at 45–47. Despite this testimony, Father testified on re-cross examination that he has, in fact, tested positive for marijuana twice since his parole in April of 2018. Id. at 54, 58.

The foregoing testimonial evidence supports the conclusion of the orphans' court that Father's conduct warranted the termination of his parental rights pursuant to Section 2511(a)(2). Father's repeated and continued illegal drug use, which resulted in multiple incarcerations, has caused Children to be without essential parental care, control or subsistence necessary for their physical or mental well-being for the majority of their lives. Further, the causes of Father's incapacity and/or refusal cannot or will not be remedied.

With respect to Section 2511(b), this Court has explained, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In re C.M.S., 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." Id. (citation omitted).

However, this Court has stated, "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." In re K.Z.S., 946 A.2d 753, 763–764 (Pa. Super. 2008) (citation omitted).

Father asserts that Grandparents failed to present competent evidence regarding the absence or presence of a bond between him and Children. Father's Brief at 20–21. He further asserts that he and Children have a strong family bond. Id. at 20.

This Court has emphasized:

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

In re Adoption of C.D.R., 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting In re N.A.M., 33 A.3d 95, 103 (Pa. Super. 2011)). In addition, our Supreme Court has stated, "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." T.S.M., 71 A.3d at 268.

Moreover, the T.S.M. Court directed that in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." Id. at 269. The T.S.M. Court observed, "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." Id.

In this case, contrary to Father's assertion, there is no evidence of a parent-child bond between him and Children. Indeed, Father has been incarcerated on and off for the majority of Children's lives. Children suffered physical and emotional trauma when they resided in Father's custody due to his actions. N.T., 7/31/18, at 85–86. A no-contact order has been in effect against Father regarding K.A.M. since he tied her up and blindfolded her in November of 2011. N.T. 8/29/18, at 16. Further, a PFA order has been in effect against Father on behalf of Children since April of 2017, based on an unspecified time when P.N.M. was in his custody, and he pointed a gun to her head. K.A.M. has not resided with Father since Father's incarceration in November of 2011. P.N.M. and A.L.M. have not resided with Father since his re-incarceration in November of 2015. The orphans' court determination that no parent-child bond exists between Father and Children is supported by the record. See In re K.Z.S., 946 A.2d at 762–763.

Virginia Johnson, a licensed professional counselor at Cen-Clear Mental Health Services, testified that she first provided treatment to Children for

issues related to Father approximately two years prior to the hearing. N.T., 7/31/18, at 11–12, 17–18, 26. Ms. Johnson testified that she continues to treat P.N.M. for Posttraumatic Stress Disorder ("PTSD"), and that K.A.M. and A.L.M. receive treatment from different providers. Id. at 10, 11. Ms. Johnson stated that P.N.M.'s PTSD is due to abuse she suffered from Father. Id. at 10–11. She further testified that P.N.M. has shown improvement since residing with Grandparents. Id. at 12–13. However, Ms. Johnson also noted that P.N.M. started to regress at the end of May or the beginning of June of 2018, which she attributed to Father's release from prison. Id. at 15. Ms. Johnson opined that P.N.M. will continue to regress if Father is re-introduced into her life. Id. at 15–16.

Ms. Finley, the former clinical supervisor at Cen-Clear Mental Health Services, provided treatment to Children, beginning in September of 2016. N.T., 7/31/18, at 79–80, 87. She testified on direct examination as follows:

Q. Did you notice any progression or regression during your therapy of the children?

A. When the girls initially started, they were exhibiting a lot of behavioral issues. They really started to make progress and make improvements. But as the time came closer that they knew their father was going to be released [from prison], they started to regress again. Very hyperactive, harder to control.

Q. And did all three girls exhibit that type of behavior?

A. Mostly [P.N.M.] and [A.L.M.].

Q. Did K.A.M. exhibit any of the type of behavior?

A. [K.A.M.] . . . was never hard to control.  She just shuts down a lot.

Id. at 79.  Ms. Finley stated that Children are afraid of Father.  Id. at 81.

Moreover, she testified:

Q. In your professional opinion, would you be concerned for all three or any children's well-being if their father was reintroduced into their lives?

A. I would be.

Q. And do you think that just seeing their father would cause the children substantial harm?

A. Yes.

Q. Now, in your opinion, during your time treating the children did the father provide the care necessary for their physical and mental well-being?

A. No.

Q. Do you have an opinion as to how the father's behavior impacted these three children?

A. They exhibit signs of trauma.

* * *

Q. What type of trauma?

A. Physical, emotional.

Id. at 85–86.

Finally, we note that Children's Counsel avers that K.A.M., then age eleven, "was adamant on being in agreement with the termination." Children's Brief at 16.  Likewise, counsel asserts that P.N.M., then age ten, "was very clear in that she wanted her Father's rights terminated."  Id. at 5.

Further, Children's counsel avers that A.L.M., then age eight, "was clear that she wanted her Father's rights immediately terminated." Id. at 6.

Based upon our careful review of the certified record and witness testimony, the competent record evidence clearly demonstrates that involuntarily terminating Father's parental rights will serve Children's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b). Accordingly, we affirm the orders.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/18/2019